**F I L E D**
United States Court of Appeals
Tenth Circuit

JUL 31 2002

**PATRICK FISHER**
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

BOARD OF COUNTY COMMISSIONERS
OF SWEETWATER COUNTY, WYOMING
and BOARD OF TRUSTEES OF
MEMORIAL HOSPITAL OF
SWEETWATER COUNTY, WYOMING,

      Plaintiffs - Appellants,

v.

JIM GERINGER, Governor of Wyoming, in
his official capacity; CYNTHIA M.
LUMMIS, Wyoming State Treasurer,
individually and in her official capacity; and
MAX MAXFIELD, Wyoming State Auditor,
individually and in his official capacity,

      Defendants - Appellees.

No. 01-8071

---

**Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 01-CV-106-J)**

---

Ford T. Bussart of Bussart, West & Tyler, P.C., Rock Springs, Wyoming, for
Plaintiff-Appellant Board of Trustees of Memorial Hospital of Sweetwater
County, Wyoming (Harold V. Moneyhun, Sweetwater County & Prosecuting
Attorney, Green River, Wyoming, for Plaintiff-Appellant Board of Commissioners
of Sweetwater County, Wyoming, with him on the briefs).

Harry D. Ivey, Assistant Attorney General of Wyoming (Hoke MacMillan,
Attorney General of Wyoming, Michael L. Hubbard, Deputy Attorney General of
Wyoming, and Douglas J. Moench, Assistant Attorney General of Wyoming, on
the brief), Cheyenne, Wyoming, for Defendants-Appellees.

Before **EBEL, McKAY,** and **BRISCOE**, Circuit Judges.

**EBEL**, Circuit Judge.


The Appellants in this case, the Board of Commissioners of Sweetwater County, Wyoming, and the Board of Trustees of Memorial Hospital of Sweetwater County, Wyoming (collectively, "Sweetwater County"), appeal a decision by the United States District Court for the District of Wyoming dismissing their suit against Wyoming's governor, treasurer, and auditor (collectively, "Wyoming"). Before the district court, Sweetwater County sought a preliminary and permanent injunction preventing Wyoming from enforcing legislation that directs funds generated from lands granted to the state by the federal government "for a hospital for miners who shall become disabled or incapacitated to labor[] while working in the mines of the state," Wyoming Act of Admission, ch. 664, § 11, 26 Stat. 222 (1890), to a "state miner's [sic] hospital board" (Hospital Board), which is charged with overseeing health services for miners in the state, Wyo. Stat. Ann. §§ 30-6-101(a), 30-6-102.  Sweetwater County contended that this new arrangement violated a federal trust created by the Act of Admission and ran afoul of provisions in the Wyoming Constitution.  After hearing arguments on

Sweetwater County's request for a preliminary injunction, the district court held that the Wyoming Act of Admission did not establish a trust for a state miners' hospital. As a result, the district court concluded that Sweetwater County's suit did not present a question of federal law, dismissed the purported federal claims for lack of subject matter jurisdiction, and declined to exercise supplemental jurisdiction over Sweetwater County's remaining state law claims.

Sweetwater County subsequently appealed to this court the district court's interpretation of the Wyoming Act of Admission. Because we conclude that, even assuming a trust exists, Sweetwater County lacks standing, we **DISMISS** this action.


## I. Background

In 1890, the state of Wyoming entered the Union pursuant to the Wyoming Act of Admission. In this legislation, Congress granted 30,000 acres of federal land to the state "for a hospital for miners who shall become disabled or incapacitated" while working in mines within the state, and declared that the land should not be sold for less than $10 per acre. Wyoming Act of Admission § 11.

Less than a year after entering the Union, Wyoming set to work building a miners' hospital. On January 10, 1891, the Wyoming legislature passed legislation calling for the location of the hospital to be chosen by popular vote

- 3 -

during the November 1892 general election. In the ensuing election, Wyoming's citizens chose the town of Rock Springs, located in Sweetwater County, to be the home of the miners' hospital; following the election, the state legislature enacted legislation calling for the construction of a miners' hospital in Rock Springs. A few years later, the state renamed the facility "The Wyoming General Hospital" and declared that "[t]he object of said hospital shall be to provide sustenance, care and medical and surgical attention for all miners who shall become disabled or incapacitated to labor while working in the mines of the state . . . and to such other persons as may be admitted under the laws, rules, and regulations established for the government thereof."

For the next fifty years, the state continued to operate and oversee the Wyoming General Hospital. In 1947, however, the Wyoming legislature transferred ownership and responsibility for the hospital to Sweetwater County. The transferring legislation specified that all income generated from the original 1890 land grant would "be paid to said county to be used" for the care of disabled and incapacitated miners, as long as the hospital served disabled and incapacitated miners. 1947 Wyo. Sess. Laws Ch. 64, §§ 2-3. The hospital was then renamed Memorial Hospital of Sweetwater County, and, from 1947 until 2001, served as the state's miners' hospital.

In 2001, however, the state legislature enacted a bill creating a "State Miner's Hospital Board." See Wyo. Stat. Ann. § 30-6-101 et seq. Under this legislation, the Hospital Board, comprised of members of the Sweetwater County Memorial Hospital Board, citizens of Sweetwater County and another county, and a member from another county hospital's board, assumed primary responsibility for addressing miners' health care needs in the state. The legislation specifically charged the Hospital Board with developing a comprehensive health care plan for miners, contracting with providers for health care services for miners, and developing regulations for determining miners' eligibility for health services. See id. § 30-6-102(b). Most importantly, the legislation declared that the Hospital Board, and only the Hospital Board, would receive money from the lands granted to the state for a miners' hospital. Id. § 30-6-102(a). In essence, it appears that the legislation implicitly repealed portions of the 1947 legislation directing that Memorial Hospital receive all income from the miners' hospital land grant and explicitly allowed the state to contract with various parties to provide health services to miners.

The present suit then followed.

## II.  Analysis

On appeal, Wyoming argues that, even if we assume the existence of a land trust, Sweetwater County lacks standing to bring the present suit because it is neither a trustee nor a beneficiary of the alleged trust.  Although the district court, having concluded that the Admission Act did not create a land trust, did not base its subject matter jurisdiction ruling on standing, standing is a "threshold issue in every case," Hutchinson v. Pfeil, 211 F.3d 515, 523 (10th Cir. 2000) (internal quotation marks omitted), which a federal appellate court may raise "at any time," regardless of whether the district court expressly addressed the question. Buchwald v. Univ. of N.M. Sch. of Med., 159 F.3d 487, 492 (10th Cir. 1998) (internal quotation marks omitted).

### A.  Standing Law

"The standing inquiry requires us to consider 'both constitutional limits on federal-court jurisdiction and prudential limitations on its exercise.'" Sac & Fox Nation of Mo. v. Pierce, 213 F.3d 566, 573 (10th Cir. 2000) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)).  Constitutional standing derives from Article III of the U.S. Constitution, which restricts federal courts' jurisdiction to suits involving an actual case or controversy.  Schaffer v. Clinton, 240 F.3d 878, 882 (10th Cir. 2001) (citing Allen v. Wright, 468 U.S. 737, 750 (1984)).  To satisfy

constitutional standing requirements, a plaintiff must demonstrate the presence of three elements:

> (1) "injury in fact"–meaning "the invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectual or hypothetical"; (2) "a causal relationship between the injury and the challenged conduct"–meaning that the "injury fairly can be traced to the challenged action of the defendant"; and (3) "a likelihood that the injury will be redressed by a favorable decision"–meaning that the "prospect of obtaining relief from . . . a favorable ruling is not too speculative."

Buchwald, 159 F.3d at 493 (quoting Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 663-64 (1993)); see also Bennett v. Spear, 520 U.S. 154, 163 (1997) ("To satisfy the 'case' or 'controversy' requirement of Article III, which is the 'irreducible constitutional minimum' of standing, a plaintiff must, generally speaking, demonstrate that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." (quoting, inter alia, Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). At its core, we have explained, constitutional standing requires a court "to ask not only whether an injury has occurred, but whether the injury that has occurred may serve as the basis for a legal remedy in the federal courts." Shaffer, 240 F.3d at 883.

In addition to satisfying the prerequisites for constitutional standing, a plaintiff must also meet, generally speaking, the requirements of prudential standing, a judicially-created set of principles that, like constitutional standing, places "limits on the class of persons who may invoke the courts' decisional and remedial powers." Warth, 422 U.S. at 499; see also Allen, 468 U.S. at 751 (describing prudential standing as "judicially self-imposed limits on the exercise of federal jurisdiction"). Under a prudential standing inquiry, a party that has satisfied the requirements of constitutional standing may nonetheless be barred from invoking a federal court's jurisdiction. Bennett, 520 U.S. at 163; Warth, 422 U.S. at 499. Like its constitutional counterpart, prudential standing establishes three conditions a party must overcome before invoking federal court jurisdiction. First, a plaintiff must assert his "own rights, rather than those belonging to third parties." Sac & Fox Nation, 213 F.3d at 573; see also Warth, 422 U.S. at 499 (explaining that a plaintiff "cannot rest his claim to relief on the legal rights or interests of third parties"). Second, the plaintiff's claim must not be "a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens." Warth, 422 U.S. at 499; see also Allen, 468 U.S. at 751 (explaining that generalized grievances should normally be directed to the legislative, as opposed to judicial, branches of government). Third, prudential standing requires that "a plaintiff's grievance must arguably fall within the zone

of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." Bennett, 520 U.S. at 163.

We have further explained that, in the federal-land-trust context, a political subdivision of a state (such as Sweetwater County) suing a state or state officials (such as Wyoming) for an alleged breach of a federal trust under the Supremacy Clause must satisfy two criteria before the suit may go forward. First, we have explained, the political subdivision should be "'substantially independent' from the state."[1] Branson Schl. Dist. RE-82 v. Romer, 161 F.3d 619, 629 (10th Cir. 1998 ) (citing Lassen v. Arizona ex. rel. Arizona Highway Dep't, 385 U.S. 458, 459 n.1 (1967)). The ability of the subdivision to elect its own representatives, to sue or be sued in its own name, or to hold property in its own name are some factors courts should consider when analyzing the "independence" component, we

---

[1]In Branson School District, we examined in considerable detail the circumstances under which a political subdivision of a state may sue the state for breaching obligations imposed under a federal land trust. We observed that, generally, municipalities and counties may not sue a state for alleged violations of the Fourteenth Amendment, because, we pointed out, that Amendment "was written to protect individual rights, as opposed to collective or structural rights." 161 F.3d at 628 (citing Williams v. Mayor & City Council of Baltimore, 289 U.S. 36, 53 (1933)). These limitations do not necessarily apply, however, when a political subdivision sues its "parent" under the Supremacy Clause of the Constitution for an alleged violation of federal law, we explained. See id. at 630 ("Thus [prior case law] supports the proposition that we make explicit today: A political subdivision has standing to sue its political parent on a Supremacy Clause violation."); see also Rural Water Dist. No. 1, Ellsworth County, Kan. v. City of Wilson, Kan., 243 F.3d 1263, 1274 (10th Cir. 2001) (explaining that a political subdivision could sue a state for a violation of "federal statutory law").

suggested.  Id.  Second, and "most importantly," we have addressed whether the political subdivision is "'essentially' the beneficiar[y] of the federal trust at issue," id., or whether it serves "'essentially [as] the trustee of the trust at issue.'" Id. (quoting Lassen, 385 U.S. at 459 n.1).

### B.  Sweetwater County Standing

With these guidelines in mind, we turn to the question of whether, assuming that the Wyoming Act of Admission created a trust for a miners' hospital, Sweetwater County has standing to sue for an alleged violation of that trust.

Considering first Sweetwater County's political subdivision status, we note that it is clear that the County and the Memorial Hospital Board of Trustees possess sufficient political independence to maintain a suit against Wyoming officials for a violation of the alleged trust.  See Branson Schl. Dist., 161 F.3d at 629.  Under Wyoming law, a county, through its board of commissioners, has the right to "[s]ue and be sued," enter contracts, and buy and sell property.  Wyo. Stat. Ann. § 18-2-101.  County commissioners are elected by the voters of each county, id. § 18-3-501(a), and have a variety of duties and responsibilities, see id. § 18-3-504, including the power to help establish and run county hospitals, id. §§ 18-8-102, 18-8-103, and appoint the trustees who oversee county hospitals, id. § 18-8-104(a).  Boards of Trustees for "county" and "memorial" hospitals, like

the board for Memorial Hospital, also enjoy considerable authority under state law, see id. § 18-8-101(a)(i) (defining county and memorial hospitals), including the right to enter contracts for services, see § 18-8-108, sue or be sued on behalf of their hospital, Collins v. Memorial Hosp., 521 P.2d 1339, 1340 (Wyo. 1974), and "manage[] and control" hospital property. Wyo. Stat. Ann. § 18-8-104(a).

Sweetwater County's ability to press its suit against Wyoming officials falters, however, when we consider the "most important[]" factor identified by Branson School District of whether the political subdivision is essentially a "trustee" or "beneficiary" of the trust. 161 F.3d at 629. In Branson School District, we explained that "[a] trust is created when a settlor conveys property to a trustee with a manifest intent to impose a fiduciary duty on that person requiring that the property be used for a specific benefit of others." 161 F.3d at 633 (citing Restatement (Second) of Trusts §§ 2, 17, 23 & 23 cmt. (a) (1959)). As Sweetwater County forthrightly conceded during oral argument, the Wyoming Act of Admission–the act through which the United States, as settlor, conveyed land for the creation of a miners' hospital–only requires Wyoming to use the 30,000 acres granted it "[f]or the establishment and maintenance and support . . . for a hospital for miners," Wyo. Act of Admission § 11 (emphasis added); the Act does not require that a particular hospital, such as Sweetwater County Memorial Hospital, be designated the state's "miner's hospital." Indeed, the alleged trust

vests responsibility for the supervision of the miners' hospital with the state and allows Wyoming to designate any hospital in the state as the miners' hospital. Moreover, Sweetwater County concedes that the state of Wyoming is the trustee for the claimed trust. Though the record indicates that in the past Sweetwater County Memorial Hospital received funds generated from the lands for the creation of a miners' hospital, we have uncovered no evidence in the record–and Sweetwater County has directed us to no such evidence–indicating that Sweetwater County administers the trust that holds the lands and directs the revenue generated therefrom.[2] See Branson Sch. Dist., 161 F.3d at 637 (discussing trustee's duties to manage trust property); cf. Lassen, 385 U.S. at 459 n.1 (finding that Arizona Land Commissioner "with custody of . . . trust lands" acted "essentially [as] the trustee" for federal land trust). Assuming, then, that the Act did create a federal land trust, the state of Wyoming serves as the trust's trustee, not Sweetwater County and not other state entities, see Wyo. Act of Admission § 11 (granting land "[t]o the state of Wyoming" for the purpose of establishing a miners' hospital) (emphasis added)), a point Sweetwater County

[2]In its complaint, Sweetwater County asserted that it was a "fiduciar[y]" of the alleged trust and is "charged by law with the responsibility of protecting the interests of incapacitated and disabled miners of the state." (Complaint ¶ 5.) The only authority remotely suggested by Sweetwater County in support of this blanket assertion, however, seems to be that it historically received money from the purported trust to care for miners.

implicitly acknowledges in its court filings. (See Aplt. Br. at 24 ("The state must hold, dispose and appropriate the lands (and the revenue therefrom) [for the support of a state miners' hospital]."); Complaint ¶ 12 (contending that the "State stands in the fiduciary capacity of trustee")).

Similarly, the parties do not dispute that miners disabled while working in Wyoming mines were the intended beneficiaries of the alleged trust, not Sweetwater County and not any particular state hospital.[3] (See Aplt. Br. at 28-29 ("The Act of Admission and Constitution explicitly articulate that the purpose of the land grant was for a Miners' Hospital for disabled or incapacitated miners . . . .")).

Because Sweetwater County, a political subdivision of Wyoming, is neither the trustee nor the beneficiary of the hypothetical trust, nor the trust's settlor, it is

---

[3]Sweetwater County alleges that the Act of Admission incorporated specific provisions of the Wyoming Constitution that further restricted the state's ability to dispose of land grants from the federal government. Because the issue is not relevant to how we resolve this appeal, we express no opinion as to whether the federal Act of Admission incorporated portions of the Wyoming Constitution. We would simply note that, like the Act of Admission, the Wyoming Constitution refers to the state's obligation to manage land grants, reinforcing the notion that if a trust exists, the state of Wyoming acts as trustee. See Wyo. Const. Art. 18 § 1 ("The State of Wyoming hereby agree to accept the grants of land heretofore made, or that may hereafter be made by the United States to the state, for educational purposes, for public buildings and institutions and for other objects . . . ."); § 4 (declaring that the state legislature shall enact laws for the "sale, disposal, leasing or care of all lands").

unable to maintain its suit against Wyoming.[4]  See, e.g., Branson Schl. Dist., 161

F.3d at 629.

## C.  Merits

Having concluded that Sweetwater County cannot satisfy the requirements

for political subdivision standing,[5] we need not address the jurisdictional question

_____

[4]Sweetwater County repeatedly argues that it has standing to press its suit in light of our decision in Branson School District.  In Branson School District, we recognized that a political subdivision of state can, in some instances, invoke federal land grant statutes, "assert[] the structural protections of the Supremacy Clause of Article VI," and sue "its creating state" in federal court for allegedly violating a federal trust.  161 F.3d at 628-29.  Branson School District does not, however, stand for the proposition that a county, or any other political subdivision of a state, possesses generalized standing to sue a state anytime it believes that the state is violating provisions of a federal trust.  Instead, we upheld the right of Colorado school districts to sue Colorado for allegedly violating a trust created by the Colorado Enabling Act.  161 F.3d at 629.  We justified this conclusion, in part, on the grounds that "these school districts [were] 'essentially' the beneficiaries of the federal trusts at issue."  Id.; see also id. (explaining how other circuits have held that "a political subdivision may bring a claim against its creating state when the claim is based on an assertedly controlling federal law and where the political subdivision assertedly is a beneficiary of that law" (emphasis added)).  By contrast, the beneficiary of the alleged trust at issue in this case is not Sweetwater County, but Wyoming's disabled and incapacitated miners.

[5]Because Sweetwater County lacks political subdivision standing, we do not resolve constitutional or prudential standing issues.  Thus, we do not address difficult issues of redressability, compare Baca v. King, 92 F.3d 1031, 1036 (10th Cir. 1996), Mount Evans Co. v. Madigan, 14 F.3d 1444, 1451 (10th Cir. 1994), Ash Creek Mining Co. v. Lujan, 969 F.2d 868, 876 (10th Cir. 1992), and Wyo. Timber Indus. Ass'n v. United States Forest Serv., 80 F. Supp. 2d 1245, 1256 (D. Wyo. 2000), with CC Distribs., Inc. v. United States, 883 F.2d 146, 151 (D.C. Cir. 1989) and W. Va. Ass'n of Cmty. Health Ctrs., Inc. v. Heckler, 734 F.2d 1570, 1572-74 (D.C. Cir. 1984), or issues of whether Sweetwater County is asserting legal rights belonging to third parties and whether its grievance falls

(continued...)

considered by the district court: whether the Wyoming Act of Admission created a federal trust for a miners' hospital.[6]  See Qwest Communications Int'l, Inc. v. Federal Communications Comm'n, 240 F.3d 886, 890 (10th Cir. 2001); Bear Lodge Multiple Use Ass'n v. Babbitt, 175 F.3d 814, 822 (10th Cir. 1999); Colorado Taxpayers Union, Inc. v. Romer, 963 F.2d 1394, 1396 (10th Cir. 1992).

## III.  Conclusion

Because we conclude that Sweetwater County lacks standing even if a federal trust exists, we **DISMISS** this appeal.

---

[5](...continued)
outside the "zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit."  Bennett, 520 U.S. at 163.

[6]We express no opinion as to what rights Wyoming state law might grant Sweetwater County.  Although Sweetwater County's complaint raised issues of state law, the district court declined to review those claims after it dismissed the underlying federal claim.  As best we can tell, Sweetwater County does not appeal this portion of the district court's ruling.  Moreover, the district court's ruling comports with our general admonishment that district courts should dismiss state claims without prejudice after all federal claims have been dismissed, particularly when the federal claims are dismissed before trial, see Ball v. Renner, 54 F.3d 664, 669 (10th Cir. 1995); Sawyer v. County of Creek, 908 F.2d 663, 668 (10th Cir. 1990), a position supported by both Supreme Court precedent, see Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 & n.7 (1988); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966), and the federal statute granting district courts supplement jurisdiction over state claims.  See 28 U.S.C. § 1367(c)(3).